UNITED STATES, Appellant,

v.

John Lewis BURRELL, Appellee.

No. 5923.

District of Columbia Court of Appeals.

Argued Oct. 14, 1971.

Decided Jan. 31, 1972.
Rehearing in Banc Denied March 2, 1972.
See 288 A.2d 248.

Robert Richard Chapman, Asst. U. S. Atty., with whom Thomas A. Flannery, U. S. Atty., John A. Terry and James B. McMahon, Asst. U. S. Attys., were on the brief, for appellant.

William J. Garber, Washington, D. C., for appellee.

Before GALLAGHER, NEBEKER and PAIR, Associate Judges.

PAIR, Associate Judge:

This is an appeal by the Government from an order suppressing as evidence [1] an operable pistol seized from appellee following a brief confrontation on a public street. The sole question is whether the arresting officer (Officer Flournoy) intruded upon appellee's fourth amendment rights by placing his hand on appellee's elbow and saying, "Hold it, sir, could I speak with you a second?" Finding no violation of any of appellee's constitutionally protected rights, we reverse.

At the hearing on the motion to suppress, there was uncontroverted testimony that about 4:00 p. m. on April 4, 1971, the officer was walking on a tour of duty in the downtown shopping district. He observed appellee on the southeast corner of 13th and F Streets, N.W., among a group of

1. D.C.Code 1967, § 23–104(a) (1) (Supp. IV, 1971).

people waiting at a bus stop. When appellee saw the officer, who was in uniform, he nervously withdrew his hand from the pocket of his trench coat and began rubbing his face. The officer stated that while this action, in and of itself, did not appear to be too significant, "[i]t just seemed that something was wrong."

The officer then walked south on 13th Street toward the corner of 13th and E Streets, periodically looking over his shoulder, and observed that appellee appeared to be watching him as he walked the entire block. The officer then turned and walked back toward the bus stop and, when within approximately 25 feet thereof, appellee left the corner, crossed F Street, walked one block north, crossed to the west side of 13th Street, and started back in a southerly direction.

The officer followed him and, approaching from the rear as he walked, placed his hand on appellee's elbow and said, "Hold it, sir, could I speak with you a second?" Appellee's instantaneous reply was, "It's registered, it's registered." When asked what was registered, he answered that his pistol was registered. The officer then conducted a search for the pistol which he recovered.

The court ruled that "when the officer put his hands on the [appellee] it was pretty apparent that the [appellee] was not free to go or move or in any way resist" and that the officer "did not have probable cause to do as he did in this case." The court then granted the motion to suppress.

The hearing judge was apparently of the view that an arrest or seizure of appellee occurred when the officer placed his hand on appellee's elbow because he applied, at that instant, the standard of probable cause. We think this was error. In United States v. James, D.C.Cir., 452 F.2d 1375 (decided November 19, 1971), it was observed with abundant supporting authority that:

It is well established that "a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest." Terry v. Ohio, 392 U.S. 1, 22, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889 (1968). Such investigatory encounters do not constitute "arrests." Young v. United States, 140 U.S.App.D.C. 333, 336, 435 F.2d 405, 408 (1970). See Allen v. United States, 129 U.S.App.D.C. 61, 64, 390 F.2d 476, 479 (1968); Bailey v. United States, 128 U.S.App.D.C. 354, 364 n.9, 389 F.2d 305, 315 n.9 (1967) (concurring opinion of Leventhal, J.); Brown v. United States, 125 U.S.App.D.C. 43, 46 n.4, 365 F.2d 976, 979 n.4 (1966).

Moreover, in Coates v. United States, 134 U.S.App.D.C. 97, 99, 413 F.2d 371, 373 (1969), the court, quoting with approval from Judge Youngdahl's opinion in United States v. McKethan, 247 F.Supp. 324 (D.D.C.1965), aff'd by order, No. 20,059 (D.C. Cir. 1966), said:

[T]he test must not be what the defendant himself . . . thought, but what a reasonable man, innocent of any crime, would have thought had he been in the defendant's shoes.

Thus in the instant case, the conclusion seems compelled that Officer Flournoy's initial confrontation with appellee did not amount to an arrest nor did it amount to a "seizure", within the purview of Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). He merely touched appellee's elbow, an action used as a normal means of attracting a person's attention. He coupled this touching with the simultaneous request to speak with appellee. Although, to a guilty mind, this request might be understood as an expression of intent to effect an arrest, taken as a whole and tested by the normal reaction of a reasonable, innocent person, it should not have been so understood. The request merely communicated a desire to speak with appellee. On these facts, therefore, the finding that an unconstitutional intrusion occurred cannot be

sustained. *See* D.C.Code 1967, § 17–305(a) (Supp. IV, 1971).

The Supreme Court, in Terry v. Ohio, *supra*, stated that society's interest in effective crime prevention and detection "underlies the recognition that a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest." 392 U.S. at 22, 88 S.Ct. at 1880.

United States v. Lee, D.C.App., 271 A.2d 566 (1970), was to the same effect. There, a police officer approached a man and asked him for identification, on the basis of a delicatessen patron's observations that the subject and a partner were acting suspiciously. We observed that this was "the kind of momentary contact which is and must be recognized as necessary to a sound police-community relationship and its commensurate effective law enforcement." We then quoted and adopted language from Judge Prettyman's separate opinion in Trilling v. United States, 104 U.S.App.D.C. 159, 183, 260 F.2d 677, 701 (1958), which reads:

> . . . I think the rule of the cases is that the police can question a person not a suspect or one who is a mere suspect, so long as the period of detention and the mode of the questioning are reasonable under the circumstances for the purpose of obtaining information.

Robinson v. United States, D.C.App., 278 A.2d 458 (1971), relied upon so strongly by appellee, is distinguishable on its facts. In that case, two men were observed by police officers walking on the street at 2:00 a. m. and were later seen standing in the garage of an apartment building. The men then left the garage, walked past the two police officers and ignored a request to stop. One officer pursued and stopped the two men while the other inquired of the desk clerk of the apartment building concerning them. After conferring with the desk clerk, the officer joined his partner who was detaining the men. After a brief interrogation and weapons search, the officers requested one of the men to return with them to the desk of the apartment building. They did not, however, advise him that he need not obey or that he was under arrest. As they proceeded, the suspect was observed to place his hand in a small leather pouch he carried on his belt and one of the officers seized his hand, reached into the pouch and discovered narcotics.

We held in that case that the confrontation became an illegal detention when the suspects involuntarily complied with the request that they accompany the police officers to the apartment building.

In *Lee, supra*, the investigation resulted in an arrest which we held was with probable cause because, during the brief detention and interrogation to determine identity, the officer was given reason to believe that Lee was carrying a pistol. Significantly enough, it was the police activity subsequent to the initial confrontation which led to the opposite result in *Robinson, supra*.

Here, the officer's action, prior to the statement by appellee "It's registered, it's registered", cannot under any theory be considered an arrest or seizure of appellee. Since the officer's action during his observation of appellee did not involve an interference with his liberty, it is unnecessary to test those actions by reasonableness standards. Unlike Terry v. Ohio, *supra*, the "initiation of physical contact" (the touching of the elbow) was not "for the purpose of searching" appellee. *Id.* 392 U.S. at 20 n.16, 88 S.Ct. 1868. Of course, once it became apparent that appellee was probably armed, his arrest and search were proper.

We hold therefore, on the foregoing authority, that the police activity complained of did not under the circumstances disclosed by this record, amount to an intrusion upon appellee's constitutionally protected rights. Accordingly, the order of suppression is

Reversed and the case remanded for trial or other disposition.

NEBEKER, Associate Judge (concurring):

Whenever a colleague dissents from a view or an opinion which I have expressed or adopted that fact gives me cause to suspect the validity of my own reasoning. Intractability, in my view, is not the hallmark of those commissioned as we are to resolution of legal questions arising from human conflict. I have thus undertaken to reappraise the factual predicate, reasoning, and conclusion expressed in Judge Pair's opinion. I remain convinced that it is correct and I fail to see how our practical and realistic reading of this record can create a worrisome erosion of rights even in the unlikely event that this factual setting would be repeated. Our holding is simply that as a matter of law no infringement on rights occurred when appellee exclaimed regarding registration of the gun. We are not concerned with what might have been justifiable police conduct had that alarmed and alarming statement not been made. Perhaps no constitutionally sanctioned intrusion was permissible on these facts, but it is clear to me that none resulted until appellee's outburst supplied an abundant basis.

In my view the dissent is predicated on a reading of the record which gives too much literal significance to the phrasing of certain questions asked of the officer. It is this fault which I also find with the trial court's ruling, telegraphed as it was by the leading questions to which the dissent clings. No holding in this constitutional area, commanding as it does all the common sense and reasonableness man can bring to bear, requires courts to abandon a realistic and practical approach to such human encounters as we have here. As I understand the dissenting opinion it would tell the officer he was constitutionally wrong in seeking to speak with appel-

lee. On this record, I cannot agree with such criticism. In short, this street encounter does not rise to constitutional dimensions.

GALLAGHER, Associate Judge (dissenting):

I dissent because I believe the majority opinion in this case will, if it stands, set a worrisome precedent in this city in the constitutional area of the right to privacy. Those who have followed the trend of judicial decisions in the past few years know the courts generally have recognized that police must be granted more leeway, within reasonable bounds, in dealing with street crimes than in years gone by when urban life was more secure for all.

This recognition was highlighted by the Supreme Court's decision in Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), which, essentially approved a procedure popularly known as "stop and frisk." But in my view, the majority opinion in this case avoids the strictures in *Terry*, and goes to an extreme hardly contemplated by the Supreme Court in that decision.

At 4 o'clock in the afternoon during the middle of April last year, a policeman was walking his beat in the downtown shopping area of this city. He went west on F Street, N.W., and turned the corner at 13th Street to go south toward E Street on the east side of 13th Street. As he turned the corner he glanced at people standing at the bus stop. He noticed appellee as he was "acting in a suspicious manner" because after he turned the corner appellee "snatched his hand out of his pocket and started rubbing his face." The officer continued all the way to 13th & E Streets, turned around and came back. He said that while he was going down the street to the next block he continuously looked over his shoulder and appellee was watching him "all the way down the street."[1]

---

1. This is a long block on a busy downtown street.

When the officer later came back to within about 25 feet of appellee, the latter crossed the street, went one block to 13th and G Streets, crossed 13th Street to the west side and started south on 13th Street at which point the officer, who had been following him, laid his hand on him and stopped him on suspicion of criminal activity with the announced purpose of interrogating him.

The officer was the only witness at the hearing on the motion to suppress and when counsel had concluded their examination of him, the trial court asked some questions in an effort to understand the officer's conduct. The following transpired:

THE COURT: I want to ask a question. It is not clear to me—I think that it was testified that while you observed the Defendant at the bus stop that he snatched his hand out of his pocket and began scratching his face. What did that mean to you? Why does that seem important?

[OFFICER]: It just seemed that something was wrong. It didn't have any significant value. When I turned the corner—

THE COURT: Were you walking or were you in a patrol car.

[OFFICER]: Walking, right.

THE COURT: Were you in uniform?

[OFFICER]: Yes, sir.

THE COURT: What was it about this man that attracted your attention?

[OFFICER]: One, the way he took his hand out of his pocket when I turned the corner and he continuously watched me as I walked down the street.

THE COURT: Did he have anything in his hand?

[OFFICER]: No, sir.

THE COURT: What was it about taking his hand out of his pocket that you felt was unusual?

[OFFICER]: Normally, people wouldn't do that when they saw a policeman.

THE COURT: Oh, I don't know. What were you basing that on?

[OFFICER]: The fact that it aroused my suspicion.

THE COURT: The fact that he took his hand out of his pocket?

[OFFICER]: Yes, sir.

THE COURT: All right. Any further questions?

[DEFENSE COUNSEL]: No further questions.

THE COURT: Thank you, Officer, you may step down. One more question. Before you detained him by taking hold of his arm, did you try to call to him to stop him?

[OFFICER]: No, sir.

THE COURT: In other words, you grabbed his arm and then spoke to him.

[OFFICER]: That's right, Your Honor.

Having heard the argument of counsel and apparently feeling that it understood the circumstances of the occurrence, the court made the following findings:

THE COURT: Anything further? The Court is prepared to rule. It accepts the description of events as presented by the police officer as his best recollection of what happened.

The Court is called upon in a case of this nature to reconstruct those events and to make a decision as to whether the officer acted as a reasonable and prudent officer would under these circumstances confronting him and whether he did have probable cause *to do as he did* in this case.

The Court does not in any way doubt that the officer had the best of intentions but as the Court was trying to find out

in the questions to the officer with regard to what it was that made him suspicious, the officer replied that the man took his hand out of his pocket and scratched his face.

In the Court's opinion this is not probable cause in this case. As to the voluntary admission the Court has some problems with that because when the officer put his hands on the Defendant it was pretty apparent that the Defendant *was not free to go or move or in any way resist.* So that, *I do not think that we are looking at a voluntary admission at all.*

The officer also indicated that he did not call to him or try to stop him prior to his *putting his hand on him from the rear at the time that he stopped him.*

The Court accepts the fact that the officer acted in good faith. This Court feels that he did not have probable cause *to do as he did* in this case so it's going to grant the motion. (Emphasis supplied.)

I think the majority opinion is wrong in several respects. In the first place, it states, "The hearing judge was apparently of the view that an arrest or seizure of appellee occurred when the officer placed his hand on appellee's elbow because he applied, at that instant, the standard of probable cause. We think this was error."

The fact is the hearing judge did not find appellee was placed under arrest. At no time during the hearing nor in the findings did the judge so much as use the word "arrest." The hearing judge stated: "The Court is called upon . . . to make a decision as to whether . . . he did have probable cause *to do as he did in this case"* and subsequently repeated, "This Court feels that he did not have probable cause *to do as he did in this case. . . ."* (Emphasis supplied.) At the end of his questions to the officer, the court asked him, "Before you *detained him* by taking hold of his arm, did you try to call to him to *stop him?"* (Emphasis supplied.) All indications are the trial court viewed the initial occurrence not as an arrest but as a seizure short of an arrest.[2]

Insofar as this court's decision holds the finding of the trial court than an arrest occurred initially was error, I think the majority is holding as error a finding never made. But this does not end the matter because the court holds as error the hearing judge's determination that appellee was "not free to go or move or in any way resist", which patently must be considered a finding that appellee was "seized" within the meaning of *Terry*; and, consequently, the officer's actions are required to be scrutinized under the reasonableness standard of the fourth amendment.[3] "It is quite

---

2. With the relatively recent emergence in the decisions after Terry v. Ohio, *supra,* of a constitutional seizure short of arrest in which the officer must have a reasonable basis for the seizure, it is understandable that the hearing judge chose to phrase his determination of the reasonableness of such a seizure under the well-known terminology of "probable cause." One commentator has said, "[S]ince the case [*Terry* seizure] is to be approached in traditional fourth amendment conceptualizations, the ultimate question remains whether there is probable cause—not for an arrest—but for a detention." Cook, Varieties of Detention and the Fourth Amendment, 23 Ala.L.Rev. 287, 299 (1971). For articles advocating the use of "probable cause" to test the reasonableness of non-arrest detentions, see LaFave, Street Encounters and the Constitution: Terry, Sibron, Peters and Beyond, 67 Mich.L.Rev. 40 (1968); Comment, Why Not Probable Cause for Stop and Frisk, 14 S.D.L.Rev. 141 (1969). *See also* Sawyer v. Craven, 325 F.Supp. 526, 530 (C.D.Cal.1971).

3. *See, e. g.,* United States v. James, D.C. Cir., 452 F.2d 1375 (decided November 19, 1971); United States v. Hines, U.S.App. D.C. (No. 23391, decided November 1, 1971); United States v. Harflinger, 436 F.2d 928, 933 (8th Cir. 1970), cert. denied, 402 U.S. 973, 91 S.Ct. 1660, 27 L. Ed.2d 137 (1971); United States v. Dowling, D.C.App., 271 A.2d 406 (1970); Commonwealth v. Hicks, 434 Pa. 153, 253 A.2d 276 (1969).

plain that the Fourth Amendment governs 'seizures' of the person. . . . It must be recognized that whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person." *Terry, supra* at 16, 88 S.Ct. 1877. In view of the majority's conclusion that there was no seizure and that the officer's actions did not involve any intrusion upon fourth amendment rights, the crucial issue becomes whether the hearing judge's finding that appellee had been seized is clearly erroneous, *i. e.*, manifestly wrong.

The trial court was careful to understand what had transpired and why. Having done so, it found that due to the officer's action in putting his hand on appellee from the rear and stopping him, at the same time saying "hold it" for purposes of interrogation, appellee "was not free to go or move or in any way resist." That finding seems entirely reasonable, and certainly not manifestly wrong, and constitutes a holding there was a seizure. *Terry, supra* at 16, 88 S.Ct. at 1877.

But, says the majority, it was error (clearly erroneous) to find a seizure because the officer "merely touched appellee's elbow" and "coupled this touching with the simultaneous request to speak with appellee." It equates the officer's action with the right of a police officer to seek information from anyone.

There is one thing wrong with that approach. The trial court found upon ample evidence that there was a seizure and nowhere does the majority meet this finding head-on, let alone say wherein it is wrong. Surely, trial judges are owed that much. The officer testified at one point he did not "grab him as if to snatch him" but "merely touched him trying to stop him." On two other occasions, while being examined by the court, the officer affirmed that after following him he took hold of his arm from the rear and stopped him for questioning. After hearing all the testimony and observing the only witness the court

concluded the officer's action constituted a seizure. I am at a loss to understand upon what basis the majority overturns this finding and substitutes its own. Having done so, it vaults to the conclusion there is no "constitutional intrusion."

Implicit in this, I should imagine, is the court's realization that appellee's action in taking his hand out of his pocket and rubbing his face plus looking down the street in the direction the officer walked, and later crossing the street to walk up the block and across, is too consistent with innocent behavior of pedestrians on any afternoon in a downtown shopping area and falls short of "articulable facts" warranting a seizure for investigation. *Terry, supra* at 21, 88 S.Ct. 1868; *see* United States v. Nicholas, 448 F.2d 622 (8th Cir. 1971).[4]

In my view, the majority opinion in this case conflicts with our decision in Robinson v. United States, D.C.App., 278 A.2d 458 (1971), where, under circumstances more suggestive of criminal activity as a matter of degree, we held the facts did not warrant a street detention by the police officers. The majority points to our decision in United States v. Lee, D.C.App., 271 A.2d 566 (1970), as supporting its position. But in *Lee* the officers were investigating a robbery of a store and were advised of suspicious activity on the part of two men nearby, one of whom was concealed behind a parked truck, at which point the officers asked them for identification and saw a bulge as the defendant reached in his pocket. The defendant was then seized and a pistol was found on his person. I consider that, unlike here, the officers there were able to articulate a reasonable suspicion to support the seizure.

I find it puzzling that the majority relies on dicta in a separate opinion by the late Judge Prettyman in Trilling v. United States, 104 U.S.App.D.C. 159, 183, 260 F.2d 677, 701 (1958), for the proposition that "the police can question a person not a suspect or one who is a mere suspect, so long as the period of detention and the mode of the

4. *See also* cases cited in note 3, *supra*.

questioning are reasonable under the circumstances for the purpose of obtaining information." I would go further and say not only a police officer may do so but any citizen has a right to seek information from anyone so long as he does not restrict the person's liberty, or "seize" him. *Trilling* did not involve the problem we have in this case; it presented solely a *Mallory*[5] question and involved the admissibility of confessions. Furthermore, in the passage quoted from *Trilling*, Judge Prettyman was discussing police activity in connection with the investigation of a reported crime. *Trilling, supra,* 104 U.S.App.D.C. at 183, 260 F. 2d at 701. There was no reported crime involved here.

The ultimate effect of the court's opinion in this case is to outflank *Terry*. Because if an appellate court may summarily overturn a reasonable trial court finding that there was an investigative seizure of one suspected of criminal activity without a reasonable basis and, instead, simply classify the police action as merely an effort to gain the suspect's attention for the purpose of obtaining information from him, then the requirement for a *Terry* stop that there be "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion" is avoided. *Terry, supra* 392 U.S. at 21, 88 S.Ct. at 1880. I think this would lead inevitably to unreasonable investigative seizures on the basis of an "inarticulate hunch," which *Terry* sought to guard against. *Terry, supra* at 22, 88 S.Ct. 1868. It should hardly need saying that the subjective good faith of an officer cannot be the test. Because if it were, "the protections of the Fourth Amendment would evaporate, and the people would be 'secure in their persons, houses, papers, and effects,' only in the discretion of the police." Beck v. Ohio, 379 U.S. 89, 97, 85 S.Ct. 223, 229, 13 L.Ed.2d 142 (1964).

I think the court is venturing into dangerous constitutional waters if it blurs essentials of *Terry* that (a) where on a show of authority by an officer a citizen is in effect restrained from walking away a "seizure" has occurred, and (b) the "seizure" must be founded upon an articulable suspicion. The way we will get into deep water is to plaster over a restraint of liberty by show of police authority with the innocuous label of "a touching with the simultaneous request to speak," as is done here by the court. One practical pitfall is that the need of the police for a self-protective frisk may be just as great but would be precluded. Because it is evident in *Terry* that *"it is temporary detention, warranted by the circumstances,* which chiefly justifies the protective frisk for weapons." *Terry, supra* 392 U.S. at 34, 88 S.Ct. at 1886 (White, J., concurring). If there is no warranted temporary detention the person "certainly need not submit to a frisk for the questioner's protection" as ". . . the right to frisk . . . depends upon the reasonableness of a forcible stop to investigate a suspected crime." *Terry, supra* at 32–33, 88 S.Ct. at 1886 (Harlan, J., concurring).

I find it rather incredulous that the concurring opinion states I feel the officer was "constitutionally wrong" in seeking to speak with appellee for a second. As I said earlier, any person may speak with any other person on the street unless he seizes him without justification. *Terry, supra* at 34, 88 S.Ct. 1868 (White, J., concurring). It would be pure fantasy to say a policeman could not do so. My main concern is that, if this decision stands, we may be embarked upon a course where after focusing on a suspect, as here, a police officer may "seize" him simply upon the basis of an "inarticulate hunch" or the subjective good faith of the officer. This is quite different from merely seeking information.

The burdens on the people and police in this crime ridden city are dreadful to contemplate. Yet, while we should give the police all reasonable "elbow room" in com-

5. Mallory v. United States, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1967).

bating this crime, we must stay within the Constitution.[6]

I think the findings of the trial court were manifestly fair and certainly not clearly erroneous, and I would affirm.

---

6. Urban crime now has such a broad base that only the naive would suppose it could be reduced to the proportions of a generation ago without a massive national peacetime effort directed to several facets of our society, such as we have not seen before.